# EXHIBIT 1

1 | Stephen D. Weisskopf (SBN 213596)
2 | sweisskopf@levatolaw.com
| LEVATOLAW, LLP
3 | 2029 Century Park East, Suite 400
| Los Angeles, CA 90067
4 | Telephone: 310-734-2026

5

6 | Attorneys for PLUTOS SAMA HOLDINGS, INC.

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

| PLUTOS SAMA HOLDINGS, INC. | Case No.: 8:21-cv-00133 |
| --- | --- |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| v. | |
| JAGEX LIMITED; YAN JINGGANG, HUARONG INTERNATIONAL TRUST CO. LTD; SHANGHAI HONGTOU NETWORK TECHNOLOGY CO. LTD; SHANGHAI HONGTOU NETWORK TECHNOLOGY CO. LTD TRUST; CHINA MINSHENG TRUST CO, LTD; PLATINUM FORTUNE, LP; ~~THE CARLYLE GROUP~~MACARTHUR FORTUNE HOLDING, LLC; BELLE LIU, an individual; DI XI HUANG, an individual; DUKE LI ZHU, an individual; and DOES 1-20 | 1. **Federal Civil RICO, 18 U.S.C. § 1962(~~b~~a)** |
| | ~~2~~2 **Federal Civil RICO, 18 U.S.C. § 1962(b)** |
| | 3. **Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)** |
| | ~~3~~4. **Breach of Contract** |
| | ~~4~~5. **Breach of Implied Covenant of Good Faith and Fair Dealing** |
| | ~~5~~6. **Conversion** |
| | ~~6~~7. **Intentional Interference with Contractual Relations** |
| Defendants. | ~~7~~8. **Tortious Interference with Prospective Economic Relations** |
| | ~~8~~9. **Declaratory Relief** |
| | ~~9~~10.   **Violation of California Penal Code §496(a)** |
| | **JURY TRIAL DEMANDED** |

1

Plaintiff Plutos Sama Holdings, Inc. ("Plaintiff") brings this Complaint against Defendants Jagex Limited ("Jagex"), Yan Jinggang ("Yan"), Huarong International Trust Co Ltd ("Huarong"), Shanghai Hongtou Network Technology Co. Ltd ("SHNT Ltd"), Shanghai Hongtou Network Technology Co. Ltd Trust ("SHNT"), China Minsheng Trust Co., Ltd. ("Minsheng"), Platinum Fortune, LP ("Platinum"), ~~and The Carlyle Group~~Macarthur Fortune Holding LLC("Macarthur"), Belle Liu ("Belle"), Di Xi Huang ("Huang") and Duke Li Zhu ("Duke") (collectively, the "Defendants") and alleges as follows:

## I. NATURE OF THE ACTION

1       This action arises from ~~the unlawful actions of Yan Jinggang,~~a criminal conspiracy devised and controlled by the criminal mastermind, Yan Jinggang, and executed with assistance by Yan's co-conspirators Huarong, SHNT Ltd, SHNT, Minsheng, Macarthur, Belle, Huang and Duke. The objective of this conspiracy was to allow Yan to launder hundreds of millions of dollars he unlawfully procured from innocent third parties through a fraudulent pier to pier lending scheme while also escaping hundreds of millions in debt obligations through the theft and control of a valuable and highly profitable company, Jagex. The Defendants significantly harmed Plaintiff who was an innocent party that was also seeking to acquire Jagex and, in fact, had a legitimate and binding claim to Jagex. Yan executed this criminal conspiracy through the actions of his agents, Belle, Huang and Duke, his corporate proxy, Macarthur, and with the direct assistance of Huarong, Minsheng, SHNT Ltd and SHNT, all of whom were aware of Yan's nefarious reputation and his criminal conduct but assisted him nonetheless in achieving his objectives in exchange for bribes.

2.      Yan is an individual who has been the subject of international criminal investigations, removal and formal censorship from the regulators of the Shanghai Stock Exchange for his participation in money laundering, bribery, and outright fraud, which include a trail of 30,000 victims in China and America, the creation of over 1,200 shell companies to funnel laundered funds, and over 404 pending civil lawsuits and criminal

1 investigations, including the criminal sentencing of his former partner Liang Zhenbang

2 and the death sentence of his former lender at Huarong, Lai Xiaomin.

3    2.3.   Yan is the "poster child" of the corruption that China is so desperately

4 trying to stop under its current political leadership. As a result, in October of 2018, Yan

5 fled his troubles in China and ran to California. There, in Orange County, unknown to

6 Plaintiff at the time, Yan through his agents deceived Plaintiff into creating and becoming

7 the general partner of Platinum to provide corporate cover for him to reinvest his

8 wrongfully obtained funds into SHNT and Jagex and thus maintain control over those

9 entities. When Plaintiff discovered Yan's involvement with Platinum, Yan directed his

10 agents to create Macarthur so he could continue to pursue his unlawful objectives. Yan

11 did all of this because he could not openly pursue his objectives as a result of his prior

12 criminal conduct. From his home in Orange County, California, Yan, the original owner

13 of Jagex from 2015 through April of 2020, directly and indirectly through his agents and

14 co-conspirators and his corporate proxy Macarthur has prevented the Plaintiff from legally

15 acquiring an interest in Jagex, a gaming company, and its controlling entity, SHNT,

16 despite the Plaintiff's legal and equitable interests in both Jagex and SHNT. Yan

17 seeksYan, first through Platinum and then through Macarthur, has sought to maintain

18 control of SHNT and Jagex by whatever means necessary.

19    3.4.   Through direct violations of the Federal Corrupt Practices Act, including, at

20 a minimum, bribery and wire fraud, Yan has directly and by use of various front men and

21 women including those controlling and involved with Platinum and Macarthur such as a

22 Belle, Huang and Duke, ripped Jagex and SHNT from Plaintiff's hands. Through this

23 action, Plaintiff will show that SHNT and Jagex are unique and irreplaceable assets, and

24 that but for Yan's illegal interference through his use of Jagex as an enterprise, Plaintiff

25 would be the owner of SHNT and Jagex.

26    4.5.   Through direct violations of California Penal Code §§ 484(a) and 496(a),

27 including the outright theft of Jagex in April of 2020 from Huarong and Minsheng, which

28 caused Minsheng and Huarong to file injunctive relief in England in April of 2020 to

prevent further theft., Platinum and The Carlyle Group,[1] for their own financial gain, purchased a stolen asset and have (1) engaged in a manner of theft and received and/or concealed stolen property as defined by California Penal Code §§ 484(a) and 496(a); or (2) aided and abetted the other defendants in receiving and/or concealing stolen property in a manner of theft as defined by California Penal Code, §§ 484(a) and 496(a).

## II. JURISDICTION

5 6.    Subject matter jurisdiction in this Court arises under the laws of the United States. 28 U.S.C. §§ 1331 and 1337.

6 7.    Personal jurisdiction and venue are proper in this Court pursuant to 18 U.S.C.A. § 1965(b) because Jagex did business in Irvine, California, most of the Defendants reside in Irvine, California, and the remaining defendants engaged in business in and with entities in Irvine, California in connection with the transactions at issue in this action. Moreover, the majority of the illegal acts impacting Plaintiff occurred in Irvine, California or were knowingly and intentionally directed at Plaintiff in Irvine, California.

## III. PARTIES

7 8.    Plaintiff PSH is a Delaware corporation domesticated to do business in California and with a principal place of business at 400 Spectrum, Irvine, CA 92618.

8 9.    Defendant Jagex is a limited liability company formed under the laws of England with its principal place of business in Cambridge, England. It has an office in Irvine, California where many of the specific activities of Yan's enterprise were orchestrated, from April of 2020 through December of 2020, providing this Court with specific jurisdiction over the subject matter of Plaintiff's claims.

9 10.    Defendant SHNT is a holding trust formed under the laws of China. Through the same conduct outlined in this complaint, SHNT had an office in Irvine, California where the specific activities of Yan's enterprise were orchestrated, from April

---

[1] Plaintiff has chosen to separately sue the Carlyle Group for its violations of the California Penal Code in California state court. *See Plutos Sama, Holdings Inc. v. The Carlyle Group, Inc.*, Case No. 30-2021-01200687-CU-MC-CJC (CA Sup. Ct., Orange County).

of 2020 through December of 2020, providing this Court with specific jurisdiction over the subject matter of Plaintiff's claims.

~~10~~11.  Defendant SHNT Ltd. is a holding company formed under the laws of China and the 100% parent of Jagex. Through the same conduct outlined in this complaint, it had an office in Irvine, California where the specific activities of Yan's enterprise were orchestrated, from April of 2020 through December, providing this Court with specific jurisdiction over the subject matter of Plaintiffs claims.

~~11~~12.  Defendant Huarong is a resident of Beijing China. It has accepted bribes and interfered with Plaintiff's legitimate business causing damage to Plaintiff in Irvine, California.

~~12~~13.  Defendant Minsheng is a resident of Beijing China. It has accepted bribes and interfered with Plaintiff's legitimate business causing damage to Plaintiff in Irvine, California.

~~13~~14.  Defendant Yan is a resident of California and has a primary address of 10 Sea Glass, Newport Beach, California 92657. Yan is the mastermind of this criminal conspiracy and directly and indirectly through his proxies such as Platinum and Macarthur, engaged in numerous criminal acts including but not limited to bribery.

~~14~~15.  Defendant Platinum has its principal place of business in Irvine, California located at 18300 Van Karman, #760, Irvine, California 92612 and was the purported vehicle that, upon information and belief, was used to unlawfully purchase SHNT and Jagex. Platinum is a special purpose vehicle entity that was established to purchase Jagex through an auction process. Plaintiff was initially the general partner of Platinum and invested significant time and expense in pursuit of Jagex while acting as Platinum's general partner until Plaintiff became aware of Yan's involvement with Platinum. Upon learning of Yan's control over and funding of Platinum's limited partner and his agents, Plaintiff immediately negotiated an exit from that entity and sold its general partnership interest to a new entity established by Yan and his agents, Macarthur.

15.   Defendant The Carlyle Group is a US based investment fund doing business in California and is holding itself out as the current owner of Jagex.

16.   Defendant Macarthur has its principal place of business in Irvine, California located at 18300 Van Karman, #760, Irvine, California 92612 and was general partner of the purported vehicle, Platinum Fortune, LLP that, upon information and belief, was used to unlawfully purchase SHNT and Jagex. Macarthur was established by agents of Yan at Yan's direction to act as a proxy for Yan's illicit scheme and take control over Platinum Fortune, which other than Yan's influence was a legitimate enterprise.

17.   Defendant Belle is a citizen of China currently residing in Hong Kong and Australia. Belle Liu acted as an agent for Platinum's limited partner Defendant Huang and repeatedly conducted business with Plaintiff here in Irvine, California with respect to Platinum

18.   Defendant Huang is citizen of China currently residing in Hong Kong. Huang was the limited partner of Platinum, which had and continues to have its principal place of business in Irvine, California.

19.   Defendant Duke Li Zhu is a Chinese citizen currently residing in Orange County, California with a principal place of business in Irvine, California located at 18300 Van Karman, #760, Irvine, California 92612 and a primary home address of 2342 Nolita, Irvine, CA 92612. Duke knowingly acted as an agent for Yan and acted as a representative of Platinum in Orange County, California.

16 20.  Plaintiff does not currently know the names of DOEs 1 through 20 and, therefore, sues said defendants by such fictitious names. Plaintiff alleges that each DOE defendant is in some way liable and at fault for the occurrences alleged herein, and each DOE defendant is responsible for the damages incurred by Plaintiff. Plaintiff will amend this Complaint to allege the DOE defendants' true names and capacities when ascertained.

17 21.  Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint, Defendants and each of the DOE defendants were the agents, servants, partners, affiliates, employees, co-conspirators and/or joint- ventures of

1   their co-defendants and in doing the things alleged in this Complaint, were acting pursuant

2   to the conspiracy alleged herein.

3       22.    The Carlyle Group is a U.S. based investment fund doing business in

4   California and is holding itself out as the current owner of Jagex. Although The Carlyle

5   Group is not named as a defendant in this second amended complaint, Plaintiff has

6   separately brought a state court action against The Carlyle Group with respect to its

7   violations of California state law.

8   <u>**IV. FACTUAL BACKGROUND**</u>

9   **A.**    **Plutos Sama Holdings, Inc.**

10   ~~18~~23.  Plaintiff is a private equity company focused on distressed assets and

11   companies. It focuses on utilizing its legal and financial experience to act as a general

12   partner on behalf of limited partners in purchasing: (1) non-performing consumer

13   receivables; both secured and unsecured; (2) restaurants; (3) online video gaming and

14   eSports; (4) micro-lending; (5) back-office services and (6) financial institutions. From

15   2012 until 2018 Plaintiff (and its legacy affiliates) focused on purchasing highly distressed

16   and contested assets sometimes referred to as "White Knight takeovers" and "hostile

17   takeovers" and created value for itself and its limited partners in doing so. In 2012,

18   through a combination of investment banking and litigation it supported and arranged the

19   bid on the insider "take back" of a financial services company offering back-offices

20   services to law firms valued at $35,000,000. From 2015 through 2018, Plaintiff through

21   its wholly owned special purpose vehicle ("SPV") purchased a $209,000,000 USD basket

22   of assets called RMBS (Residential Mortgage-Backed Securitization) from the Royal

23   Bank of Scotland in New York, New York. From 2015 through 2018 it bid on and won

24   assets in central and eastern Europe ("CEE") and was often referred to as the "White

25   Knight," "grey knight" or "black knight" bidder when bidding on assets such as the $1.3b

26   basket of assets as lead general consortium partner backed by a multi-billion dollar US

27   based institutional hedge fund; much like The Carlyle Group. Plaintiff has bid on

28   distressed residential assets, distressed restaurants, distressed debt servicers, distressed

1   loan pools from banks such the SHNT Trust and its coveted Jagex subsidiary at issue in

2   this case, and other financial institutions such as specific troubled banks being auctioned

3   off by the governments in CEE. Plaintiff was the perfect general partner to bid on and win

4   the SHNT Trust as a unique basket of assets containing the coveted Jagex prize.

5   **B.      SHNT and SHNT Ltd.**

6   ~~19~~24.   SHNT Ltd is a holding company that holds the 100% interest of Jagex.

7   SHNT is a trust formed as part of a credit restructuring in China by Huarong, Minsheng[2]

8   and Yan to provide Yan a three-year period to resolve Yan's debts in China. SHNT's

9   assets at issue include (1) debts owed by Yan to SHNT in amounts of approximately

10  $100,000,000 USD (the "Yan Debt"), (2) SHNT, Ltd, the 100% owner of Jagex and (3)

11  various other unique assets identified below. SHNT is not publicly traded on any

12  exchange. It is a unique asset that cannot be traded or sold without following specific

13  Chinese law. Transactions which affect assets in SHNT must be approved by the requisite

14  Chinese regulatory boards. As described in detail herein, Plaintiff won a 55% interest in

15  SHNT at a public auction and received an agreement to transfer the rights to Plaintiff from

16  Huarong in September of 2020. Previously, Huarong took a 55% ownership of SHNT on

17  April 17, 2020 pursuant to a Court Order in China after two public auctions to foreclose

18  on the asset from Yan's closely held public company. It was on this asset that Plaintiff

19  followed the SASAC rules further defined below to bid on and win its 55% ownership

20  interest in SHNT and all assets contained therein, including Jagex. Although Plaintiff

21  terminated the auction house's obligations in connection with the auction it did so based

22  on the representation and explicit agreement from Huarong that Plaintiff would retain its

23  contractual right to purchase 55% of Jagex from Huarong. As such, Plaintiff is a 55%

24  owner of all assets within the SHNT bucket, including but not limited to, the Yan Debt

25  and Jagex.

26

27

28

---

[2] Huarong and Minsheng are trusts organized under state-run banks for the primary purpose of debt collection. As more fully described herein, Huarong and Minsheng were creditors of SHNT, and as such, negotiated with Yan to resolve their claims against SHNT and ultimately became participants in the Jagex enterprise.

## C.     Jagex

~~20~~25.   Jagex is a PC gaming powerhouse and within the gaming community, it has become an empire which has withstood the test of time. The most well-known game produced by Jagex is RuneScape, a virtual world where players can become their own heroes by completing quests and traveling through different landscapes with their teammates while searching for riches and battling rivals. RuneScape has been on the market for over 20 years and has amassed 260 million players, easily making it an asset worth over $1 billion USD.[3] While RuneScape is its most popular and profitable game, Jagex also offers other eSports games on its platform. Considering the level of loyalty, brand familiarity, and goodwill maintained by Jagex, it is a unique, one-of-a-kind asset.

~~21~~26.   In 2015, Jagex was purchased for $350MM USD by Shanghai Fukong ("Fukong") a publicly traded company on the Shanghai Stock Exchange listed as SSE:600634 (SSE refers to the Shanghai Stock Exchange). Jagex was placed in a subsidiary which was wholly owned by Fukong called SHNT Ltd. Yan owned 85% of Fukong with one other partner, making it a closely held company. Due to internal turmoil and financial difficulty within SHNT Ltd as described below, Huarong and Minsheng met with Yan in 2017 and restructured the debt Yan borrowed from Huarong and Minsheng into SHNT. Starting in 2017, Yan began bribing the government officials at Huarong and Minsheng in an attempt to slow down the foreclosure process of SHNT by the respective trusts and maintain control of SHNT and Jagex.

~~22~~27.   In 2019, Yan was barred from the securities industries[4] and the purported responsible officers and directors of Fukong sought to sell SHNT, which included 100%

---

[23] *See Jagex Website*, https://www.jagex.com/en-GB/products

[34] As reported by jqknews in an article titled: *Two lawyers involved in financial fraud of 3 listed companies of China Technology Department: investors rights can be protected*

"According to the CSRC, it plans to order ST Fukong to make corrections, give a warning and impose a fine of 600,000 yuan; give a warning to Yan Jinggang and impose a fine of 600,000 yuan; give a warning to 15 responsible persons, including Wang Xiaoqiang, Zhu Jianzhou and LV Yandong, and impose a fine of 30,000-200,000 yuan. A total of 2.65 million yuan is to be fined.

It is worth noting that this is the second time that Yan Jinggang has received advance notice of [a] lifelong ban this year. On March 10, 2020, ST Yufu received the prior notice of administrative punishment and market ban issued by the CSRC. As the actual controller of ST Yufu, **Yan Jinggang organized, planned, led and implemented the**

1   of Jagex, via a regulated Chinese auction. However, unbeknownst to Plaintiff, this entity

2   was still being controlled by Yan. Yan, as described below, devised a strategy to ensure

3   that the winning bidder was an entity that would be controlled or influenced by him so

4   that he could maintain his ownership of the unique assets of SHNT. Again, from October

5   of 2018 through the present, Yan has been bribing government officials at Huarong and

6   Minsheng to make sure he could maintain control of SHNT and Jagex.

7   **D.    Plaintiff's Introduction to Jagex**

8          ~~23~~28.  In late 2018, Plaintiff was approached by agents of Yan named Di Xi Huang

9   ("Huang"), through his agents, Belle Liu and Duke Li Zhu, regarding the unique value of

10  Jagex, SHNT and the upcoming auction by Fukong.

11  Recognizing the value and opportunity of the proposed transaction, Plaintiff agreed to

12  form a limited partnership with Huang, called Platinum Fortune, LP ~~("Platinum"),~~, for the

13  purpose of managing the bidding and acquisition of SHNT and Jagex at the scheduled

14  auction. Platinum was formed on April 11, 2019 in Delaware by Plaintiff, with Huang

15  serving as the limited partner owning 98% and the Plaintiff serving as the general partner

16  owning 2%. Plaintiff was unaware at the time that Huang and his representatives Belle

17  Liu and Duke Li Zhu were ~~associates~~agents of Yan, and that Yan by and through his

18  ~~associates~~agents, induced Plaintiff to form Platinum ~~and purchase~~so that he could use that

19  entity through his agents to reap the rewards of his illicit scheme by using unlawfully

20  obtained funds to purchasing SHNT with the express purpose of maintaining Yan's status

21  quo as the *de facto* owner and operator of SHNT and Jagex.

22

---

23  **illegal acts involved in the case. The CSRC intends to decide to take lifelong measures to ban him from
    entering the securities market** (emphasis added).

24  Upon information and belief, Yan Jinggang fled China in 2018 and moved to Orange County, California and started
    working with Carlyle sometime in 2020 to buy SHNT and block the Plaintiff from acquiring it. Not once did Yan
25  Jinggang or Carlyle follow the proper auction instructions as required under Chinese law.

26  As reported by Reuters, "As early as January 19, 2018, ST fukong, ST Youfu and Hongda Mining announced at the
    same time that the CSRC decided to file a case against Yan Jinggang for suspected violation of securities laws and
27  regulations."

    Reuters similarly reported that Shanghai Fukong the former closely held owner of Jagex says its owner, Yan
28  Jinggang was barred from re-entering the securities market for life due to the violation. *See* BRIEF-Shanghai Fukong
    Interactive Entertainment, Executives Warned And Fined By Securities Regulator For Violation | Reuters.

2429.  Yan achieved this by making payments utilizing the interstate wire system that were orchestrated from Irvine, California, Hong King, China and Australia to members of ~~Platnium~~Platinum in Irvine, California and from locations in Irvine to governmental officials at Huarong and Minsheng in China as an act in furtherance of his scheme to keep Jagex. Specifically:

    a. November 2018 – to ~~Platnium~~Platinum limited partners Belle Liu and Duke Li Zhu amounts in excess of $1,000,000~~, which upon~~. Unknown to Plaintiff, these funds were not lawfully obtained but the proceeds of Yan's fraudulent pier to pier lending scheme. Upon information and belief, Belle Liu and Duke Li Zhu knew the source of these funds and thus knew that these were not lawfully procured funds. These funds were used to operate Platinum and thus, unknown to Plaintiff at the time, to further Yan's scheme to wrongfully maintain control over Jagex and SHNT by any means possible.

    b. November 2018 – present (as further described below) to Minsheng officials in the following amounts:

        i. November 2018 - $20,000

        ii. December 2018 - $20,000

        iii. January 2019 – approximately $20,000

        iv. February 2019 -approximately $20,000

        v. March 2019 -approximately $20,000

        vi. April 2019 -approximately $20,000

        vii. May 2019 -approximately $20,000

        viii. June 2019 -approximately $20,000

        ix. July 2019 -approximately $20,000

        x. August 2019 -approximately $20,000

        xi. September 2019 -approximately $20,000

        xii. October 2019 -approximately $20,000

        xiii. November 2019 -approximately $20,000

xiv.   December 2019 -approximately $20,000

2530.  In accordance with the purpose of the limited partnership, Platinum, through Plaintiff, as general partner, submitted a bid and won the auction in June of 2019 at the list price of $500MM USD, which was subsequently raised to $530MM USD. Fukong issued a press release detailing the transaction and named Plaintiff and Platinum as the winning bidders of SHNT and Jagex. Plaintiff and Fukong drafted and delivered a Stock Purchase Agreement to formalize the purchase.

2631.  The transfer of SHNT and Jagex, however, failed to finalize and remained pending throughout the remainder of 2019 through no fault of the Plaintiff. Upon information and belief, this delay was due to Yan's control and influence over the transaction (as discussed below). Further, Plaintiff believes that it was an intentional target of Yan. As an American company with significant assets and no business operations in China, the Plaintiff was the perfect victim to string along with promises of ownership of SHNT and Jagex while Yan continued to control the assets behind the scenes and siphon money into the enterprise from innocent third parties and, most importantly, ensure he got his own debt back, so he did not have to pay it.

**E.      Jagex is an Enterprise Controlled by Yan**

**E.      Plaintiff Discovers Yan's Involvement in Platinum**

2732.  Prior to the auction, Plaintiff began to have suspicions that Yan might have some involvement in Platinum.

2833.  As such, Plaintiff contacted Huang's agent, Belle Liu, regarding the matter. InDuring numerous telephone conversations on or about March and April 2019, Duke and Belle repeatedly fraudulently represented to Plaintiff that, among other things, a) neither of them nor Huang, Platinum's limited partner, had any association or relationship with Yan; and b) the source of funds being used to fund Platinum's operations and the acquisition of SHNT and Jagex was lawful. During these conversations Belle Liu was either in Hong Kong or Australia and, during some of these conversations Duke was in Hong Kong or otherwise outside of the state of California. Duke and Belle made these

1  representations knowing they were false and did so with the specific intent of deceiving

2  Plaintiff and inducing Plaintiff to continue to serve as Platinum's general partner.

3  34.     Plaintiff reasonably relied upon these fraudulent representations by Duke

4  and Belle. Notwithstanding, in order to further protect itself, the Plaintiff drafted a

5  "Comfort Letter" dated April 10, 2019, specifically memorializing the verbal

6  representations it had received from Belle and Duke, to be signed by Huang which. The

7  Comfort Letter included affirmations that, *inter alia*, (a) the funds used for the purchase

8  were not supplied by or affiliated with SHNT or Fukong, (b) that Huang was not affiliated

9  with SHNT or Fukong, (c) that Huang was not instructed to pursue the purchase on behalf

10  of anyone employed by or affiliated with SHNT or Fukong, (d) that Huang would not

11  repay the debts or provide any financial incentives to persons associated with SHNT and

12  Fukong, and (e) that Huang did not have any interest-sharing scheme or financial

13  relationship with SHNT and Fukong. Huang signed the Comfort Letter, and at Huang's

14  instruction it was delivered via electronic mail from Belle Liu, Huang's (and, unknown to

15  Plaintiff, Yan's) agent, to the Plaintiff and his attorney (in Irvine, California) via email

16  from either Australia or Hong Kong[5] on or about April 20, 2019, prior to Plaintiff's bid on

17  SHNT at the Chinese auction. Plaintiff now knows that all these representations were

18  false. At the time, however, Plaintiff reasonably relied on the these fraudulent

19  representations of Huang, which ultimately proved to be false.

20  35.     Subsequent to execution of the comfort letter, Belle, Duke and Huang

21  continued to conspire to hide their relationship to Yan and the true source of the funds.

22  Among other things, in or about May of 2019, Belle and Duke informed Plaintiff that

23  Huang, as the limited partner of Platinum was borrowing the money for the Jagex

24  transaction from a third party, "D.L". Belle and Duke made these representations via

25  emails that were sent by Belle from either Hong Kong or Australia and Duke made some

---

[45] Belle Liu represented that she would often travel between her home in Australia to her office in Hong Kong (where she represented Mr. Huang resided) to facilitate the transaction and Plaintiff is unsure as to whether Ms. Liu was in Australia or Hong Kong at the time of sending the interstate email communication containing the executed Comfort Letter on or about April 20, 2019. This travel became problematic when COVID19 hit in China and at that point it is believe believed Belle became stuck in Australia until travel restrictions were relieved in China.

of these representations during phone calls made from outside of the state of California. Plaintiff now knows these statements were false and intended to prevent Plaintiff from discovering the true source of funds.

29 36.  After Plaintiff's auction win was announced as the to-be owner of SHNT and Jagex through Platinum, it began receiving troublesome communications from third parties stating that Fukong's financial distress was a result of participation in a fraudulent peer-to-peer lending scheme in China impacting over 30,000 individual victims and 1,200 shell companies. The discovery and investigation of the scheme caused several key executives, including Yan, to flee China on or about October of 2018 due to allegations of misappropriation of billions of dollars in corporate funds.

30 37.  The Plaintiff also discovered through these third parties that Platinum was a cog in Yan's criminal wheel. Based on third-party statements, Plaintiff learned that the funds supplied by Platinum to facilitate the purchase of SHNT and Jagex were *stolen funds* from Fukong and Yan.

31 38.  Plaintiff further investigated the source of the funding out of an abundance of caution. In furtherance of this fraud, Plaintiff was emailed a "proof of funds" on June 19, 2019 from Belle Liu, at the direction of Duke and Huang, originating from either Hong Kong or Australia to Irvine, California, via interstate email verifying Defendants' ability to fund the acquisition as the limited partner, by producing copies of a bank account statement located in Germany at Deutsch Bank that was being used for the transaction, and the primary source of funds (nearly $1.5 billion Euros) originated from an individual, "D.L.", who had no traceable connection to an asset, entity, or family member which would explain his source of funding and whose demographic information rendered it unlikely that he amassed the funds privately.[6] On or about April 25, 2019 and again on July 18, 2019, lawyers and investment bankers conducting due diligence on behalf of Fukong and the Shanghai Stock Exchange physically flew to Irvine, California and personally interviewed Plaintiff and Yan's representatives; Duke Li Zhu and Belle Liu, to

---

[5][6] D.L.'s identity is withheld from this complaint due to safety concerns.

confirm that their concerns that Yan was involved in the attempt to maintain control of SHNT and Jagex were unfounded. During this interview Duke Li Zhu requested that Plaintiff ~~simply~~fraudulently represent it had the funds from one of its former limited partners[7] and Plaintiff refused. As such, Duke Li Zhu was boxed into a corner and ~~started to revel~~fraudulently stated that the money would be lent from the gentleman named "D.L." (as described above) to Huang for the purchase, ~~which based on subsequent events~~despite having knowledge that the money was ~~clearly a lie.~~in fact under Yan's control and that the true source of the funds was Yan's illicit gains from his unlawful racketeering activity in China. These interviews were later placed in written official minutes ~~and~~that were approved by Duke and Huang and were emailed by Belle back and forth from Australia to Hong Kong to Shanghai and Irvine, California on or about July 18-22, 2019. Belle did so with Duke and Huang's explicit knowledge and approval and did so despite Belle, Duke and Huang's knowledge that these minutes contained fraudulent representations by Duke regarding the source of the funds. Accordingly, the Plaintiff was starting to see more "footsteps" in the snow ~~deducing~~suggesting that the direct and circumstantial evidence regarding Yan's involvement with the transaction and source of funding were likely true ~~and when it~~. In February 2002, Plaintiff received a final piece of evidence ~~in February of 2020, Plaintiff~~indicating Yan was behind Belle, Duke and Huang and determined ~~to~~it must separate from Platinum in light of Platinum's limited partner's connection to and receipt of illicitly obtained funds from the international criminal mastermind Yan.

~~32~~39.  When Yan's involvement in Platinum became apparent, Plaintiff quickly negotiated an exit from Platinum through a Membership Unit Purchase Agreement ("MUPA"), executed on or about February 25, 2020, whereby the Plaintiff sold its general partner interest in Platinum to MacArthur ~~Fortune Holdings, LLC ("MacArthur")~~, another entity Yan indirectly controlled through Duke and others, and reported the matter to the local authorities in California. Due to the sale, MacArthur became the purported owner of

---

[7] To protect the reputation of this limited partner, Plaintiff is withholding the name of the US based hedge fund.

Jagex on April 28, 2020 and started to operate in Irvine, California as a Jagex office.[8] MacArthur then went on a media blitz to make its newly formed company look like a seasoned purchaser of assets like Plaintiff. MacArthur, however, did not own Jagex and never paid a penny for its ownership as would soon be revealed by actions Minsheng took in England to stop MacArthur, Jagex, Platinum, and its current front person Duke Li Zhu.[9] Notwithstanding, on April 28, 2020 Macarthur fraudulently represented to the world through a news release on its website that Platinum, which it controlled as its new general partner, was the legal owner of Jagex and that Platinum had paid $530 MM to purchase Jagex. Macarthur did this to create market confusion and thereby to interfere with Plaintiff's investors and to place a cloud on the title of Jagex to prevent Plaintiff from negotiating a highly profitable re-sale of Jagex to interested third parties. Macarthur was aware of Plaintiffs' negotiations with such third parties and was aware that its actions would interfere with those negotiations. Indeed, Macarthur's strategy was successful as this announcement did cause significant market confusion and did interfere with Plaintiff's relationship with its potential investors as well as its negotiations with third parties interested in purchasing Jagex from Plaintiff at a profit.

**F.    Huarong and Minsheng Acquire SHNT and Jagex Through Judicial Foreclosure Before Platinum Fortune Purportedly Acquired it From Fukong[10]**

---

[78] To be clear, MacArthur does not maintain legal title to Jagex, as it is still owned by SHNT. The documents conveying Jagex to MacArthur are suspicious and Plaintiff doubts their legitimacy. MacArthur seized control and operations of the enterprise in April 2020 after the award of SHNT and Jagex to Huarong and Minsheng on April 17, 2020 by back dating documents. Because Huarong and Minsheng had been awarded SHNT as part of their foreclosure on the asset in China on April 17, 2020, they rushed into Court in England to protect their ownership and a Court in the United Kingdom issued a "Stop Order" on April 29, 2020, preventing MacArthur, Jagex, or Yan's agents from selling or transferring shares of Jagex and/or distributing dividends from Jagex profits. The order was in effect until December of 2020, when the proceeding was dismissed under mysterious circumstances.

[9] It is noteworthy that all the due diligence completed by the Shanghai Stock Exchange to validate the legality of the sale of SHNT to ~~Platnium~~Platinum was based on Plaintiff as general partner and Plaintiff's ultimate beneficial owners and on Plaintiff's capacity as a qualified bidder and owner in due diligence. No due diligence was done on Duke Li Zhu as a beneficial owner and his Yan enterprise partners and their "swoop" takeover of SHNT and its assets in April of 2020, which appears to have now been handed off to the Carlyle Group, after the asset had already been seized by Huarong and Minsheng pursuant to a Court order dated April 17, 2020, it was done so in violation of all of the representations made to the SSE thereby making the Carlyle Groups' claimed acquisition *void ab initio* as based on illegal contracts and the coerced acquiescence and/or participation of Huarong and Minsheng in delivering the assets through ~~Platnium~~Platinum and given their public claims to the asset now makes them trustees of the asset under California Penal Code §496(a).

[10] Plaintiff also has rights under the MUPA it preserves should any Court ultimately rule that ~~Platnium~~Platinum legally acquired SHNT and Jagex.

33 40.   The Plaintiff continued to follow news and updates regarding SHNT and Jagex. In early 2020, the Plaintiff learned that two creditors of SHNT, Huarong and Minsheng, had initiated foreclosure proceedings against the company in order to capture SHNT's outstanding debts. The foreclosure was to be followed by an auction, where interested bidders could acquire SHNT and Jagex. This seemed like the perfect opportunity for the Plaintiff to finally obtain its legal rights and ability to control Jagex. As SHNT was still the legal owner of Jagex, a successful bid on SHNT would include the acquisition of Jagex.

34 41.   Huarong and Minsheng are trusts which are state owned entities and act on behalf of state-run financial institutions to collect bad debt on the banks' behalf. Officers of the trusts also held positions within the Chinese government, and the trusts operated as governmental entities, with strict oversight by the Chinese government.

35 42.   The first auction for SHNT and Jagex was conducted in March of 2020[11], but the Plaintiff was not ready to submit a bid. Luckily, no bids were submitted during the first auction, so a second auction was scheduled by the Chinese Court. While preparing for the second auction, the Plaintiff had independent conversations with Fukong regarding a direct purchase of Jagex through a private sale. The Plaintiff submitted a formal offer for the purchase of Jagex on or about March 21, 2020 and presented proof of funds through its lender.

**G.      Yan Makes Bribe to Chinese Government Official**

36 43.   Surprisingly, soon after tendering the offer to purchase Jagex, between March 26th and April 1, 2020, false allegations were made against PSH's lender which resulted in a temporary freeze of the lender's assets (including those necessary to complete the Jagex purchase deposit of approximately $30,000,000 USD). Upon information and belief, the allegations made against the lender were facilitated by Yan, who bribed a senior government official of the Republic of China ("Government Official") to bring

---

[11] See https://www.gpai.net/sf/item2.do?Web_Item_ID=27569

1  claims against the lender.[12] Yan negotiated the bribe while living in the United States and

2  facilitated the payment of the bribe to the Government Official in China through the use

3  of electronic communications from the United States.

4       3744.  Yan was attempting to block the sale because he accepted a $100MM USD

5  loan from SHNT which remained unpaid, and he likely believed that SHNT's successor in

6  interest would attempt to enforce the debt and collect same from Yan. Further, Yan

7  realized that the Plaintiff was unwilling to be a participant in the enterprise, and as such,

8  the sale of SHNT and Jagex to the Plaintiff would prevent him from continuing to operate

9  and control Jagex.[13] As such, the bribe to the Government Official was for the express

10  purpose of continuing the operation of the enterprise, Jagex.

11      3845.  Yan's villainous and nefarious actions were successful, and the Plaintiff was

12  incapable of tendering funds to finalize the purchase through its lender due to its assets

13  being unjustifiably frozen. To be sure, had Yan not interfered with Plaintiff's attempts to

14  lawfully acquire SHNT and its assets including Jagex at the time through the lawful

15  auction process Plaintiff was participating in, Plaintiff would have won the auction for a

16  value of approximately $200,000,000 USD for the entire 100% basket of assets as

17  described in the auction description. Therefore, Yan was the direct and proximate cause of

18  harm to Plaintiff. As a result, a second judicial auction of SHNT occurred. No other party

19  bid on the asset and the second auction failed. The ownership of SHNT and Jagex was

20  then judicially transferred to its creditors, Huarong and Minsheng. On April 17, 2020 the

---

[12] The Plaintiff is aware of the identity of the government official but does not disclose his identity here due to safety concerns.

[13] It is noteworthy that one of the responsible directors and currently listed board member of Jagex is Mr. Tyler Parker of The Carlyle Group who also lives in California and was probably the most likely Carlyle representative to have attended the video calls with Yan and the Trust companies in the scheme that Yan implemented to maintain control of the Jagex enterprise with a "friendly" that was local to him. Whether Carlyle knew who it was working with or not should have been obvious by a simple due diligence internet search and required them to enter the transaction through a source other than Yan or ~~Platnium~~Platinum. It is Plaintiffs' position that the only lawful way to enter the transaction was through a proper SASAC auction following the April 17, 2020 award of the SHNT asset to Huarong and Minsheng, which it indeed won at a minimum 55% of in September of 2020 pending workout of the logistics to complete the process. Carlyle Group as a named Defendant herein only in its capacity as claimed owner of Jagex should have seen the obvious deal spoiler requiring them not to attend to the transaction through Yan or ~~Platnium~~Platinum, but to find a lawful means of acquiring it as Plaintiff did. The very same victims that sent Plaintiff warning of Yan sent similar emails directly to Carlyle months before the January 22, 2020 purported announcement of the sale of Jagex to Carlyle. When Plaintiff received these communications, it stopped and investigated. Carlyle did not.

Shanghai No. 2 Intermediate People's Court issued an order transferring 100% of the interest in SHNT to Huarong and Minsheng (Huarong received a 55% interest and Minsheng received a 45% interest). As provided below the Chinese Court ordered, in relevant part:

> The (2018) Jingfangyuan Zhizi No. 0037 issued by the Beijing Fangyuan Notary Public Office on February 27, 2018 has become legally effective. The execution certificate is confirmed and the executed person is <u>Shanghai Fukong</u> Interactive Entertainment Co., Ltd., Shanghai Zhong Technology Enterprise Group Co., Ltd., <u>Yan Jinggang</u>, and Shanghai Hongtou Network Technology Co., Ltd.
>
> . . .
>
> Because Shanghai Fukong Interactive Entertainment Co., Ltd. The company, Shanghai China Technology Enterprise Group Co., Ltd., Yan Jinggang, and Shanghai Hongtou Network Technology Co., Ltd. failed to perform their obligations, and the right holder Huarong International Trust Co., Ltd. applied to this court for enforcement. During the execution of this court, <u>on March 9, 2018, the executor Shanghai Fukong Interactive Entertainment Co., Ltd. held 100% of the equity of Shanghai Hongtou Network Technology Co., Ltd. (55% of which was pledged to the executor Huarong International Trust Co., Ltd.). This court found that on January 26, 2018, the People's Court of Shaoyang County, Hunan Province froze 100% of the equity of Shanghai Hongtou Network Technology Co., Ltd. held by Shanghai Fukong Interactive Entertainment Co., Ltd</u>. On June 21, 2018, the Shaoyang County People's Court of Hunan Province handed over the right to dispose of the above-mentioned frozen equity to this court. Therefore, from March 29th to April 1st, 2020, this court against the enforcee Shanghai Fukong Interactive The 100% equity of Shanghai Hongtou Network Technology Co., Ltd. held by Entertainment Co., Ltd. went through an online public auction, and finally passed the auction for RMB 2.0422.3 billion.

*Later, the executor Huarong International Trust Co., Ltd. applied to this court for debt settlement of the 55% equity of Shanghai Hongtou Network Technology Co., Ltd. held by Shanghai Fortune Interactive Entertainment Co., Ltd. and pledged to the executor. In accordance with Article 19, Article 23, and Paragraph 2 of Article 29 of the Provisions of the Supreme People's Court on the Auction and Sale of Property in Civil Enforcement by the People's Court, the court ruled as follows: 1. Lift the freezing of 100% equity of Shanghai Hongtou Network Technology Co., Ltd. held by Shanghai Fortune Interactive Entertainment Co., Ltd. 2. **The 55% equity of Shanghai Hongtou Network Technology Co., Ltd. held by the executor Shanghai Fukong Interactive Entertainment Co., Ltd. will be valued at RMB 1,123,276,000 and delivered to the executor Huarong International Trust Co., Ltd.** to offset the principal of RMB 11.1 100 million yuan and related interest and notarization fee of RMB 13,276,000. **The ownership of the 55% equity of Shanghai Hongtou Network Technology Co., Ltd. held by Shanghai Fortune Interactive Entertainment Co., Ltd. will be transferred from the time this ruling is delivered to the executor Huarong International Trust Co., Ltd.** 3. The executor Huarong International Trust Co., Ltd. can take this ruling to the registration institution and unit to go through the relevant equity transfer registration procedures. **The presiding judge Qian Songqing Judge Zhu Wei Judge Huang Wenwei April 17, 2020.**

**H.      Yan Bribes Jagex Top Officials to Keep Quiet**

46.     In order to try and avoid losing control of Jagex as a result of this order, Yan, through Macarthur and its agent, Duke, unlawfully seized control over Jagex. Specifically, through Platinum and based on fraudulent back-dated purported amendments to the original SPA between Platinum and SHNT, Yan took over control of the Jagex board of directors without paying a penny for the purchase of Jagex. Aware of Plaintiff's ongoing negotiations to purchase Jagex, Yan also took actions to interfere with Plaintiff's legitimate business negotiations. Specifically, based on this purported sale, Macarthur

1   publicly claimed to be the purported owner of Jagex on April 28, 2020 and started to

2   operate in Irvine, California as a Jagex office. Macarthur then went on a media blitz to

3   make its newly formed company look like a seasoned purchaser of assets like Plaintiff.

4   Macarthur, however, did not own Jagex and never paid a penny for its ownership.

5   Notwithstanding, on April 28, 2020 Macarthur fraudulently represented to the world

6   through a news release on its website that Platinum, which it controlled as its new general

7   partner, was the legal owner of Jagex and that Platinum had paid $530 MM to purchase

8   Jagex. Macarthur did this to create market confusion and thereby to interfere with

9   Plaintiff's investors and to place a cloud on the title of Jagex to prevent Plaintiff from

10   negotiating a highly profitable re-sale of Jagex to interested third parties. Macarthur was

11   aware of Plaintiffs' negotiations with such third parties and was aware that its actions

12   would interfere with those negotiations. Indeed, Macarthur's strategy was successful as

13   this announcement did cause significant market confusion and did interfere with

14   Plaintiff's relationship with its potential investors as well as its negotiations with third

15   parties interested in purchasing Jagex from Plaintiff at a profit.

16       35 47.  When Yan's front company, Platinum, and his main front man, Duke Li

17   Zhu, unlawfully seized control of Jagex on April 22, 2020, in violation of the April 17,

18   2020 Chinese Court award granting ownership to Huarong (55%) and Minsheng (45%),

19   Minsheng and Huarong rushed into the High Court of England and obtained the April 29,

20   2020 Stop Notice refraining (much like a preliminary injection in the United States) any

21   individual or company from the following:

22       "1.1 Registering a transfer of any of the shares of Jagex Limited."

23       "1.2 Paying any dividend or interest in respect of the shares of Jagex Limited."

24       48.     This dispute was covered by certain media outlets, thereby interfering with

25   Macarthur and Yan's attempts to demonstrate control over Jagex. True to form, Yan's

26   corporate proxy, Macarthur, once again resorted to outright fraud on the market by issuing

27   a news release on May 1, 2020 stating that "Neither Macarthur Fortune Holding LLC nor

28   Platinum Fortune has received a Stop Order from the British Court." As of the date of the

1  filing of this complaint, that fraudulent news release remains on Macarthur's website

2  without any correction even though Macarthur and Platinum cannot possibly dispute the

3  existence of the stop order given that each made numerous filings in the British Court in

4  order to, among other things, try and get the stop order lifted.

5      49.   On Indeed, on June 21, 2020, some of the DefendantsPlatinum, pursuant to

6  instructions from its general partner Macarthur, even went back to Court and demanded a

7  fortification of $35,000,000[14] to protect Jagex against various damages it claimed might

8  occur while the Stop Notice was in force, one of which is of particular interest:

9       "The potential loss of senior managers attributable to the injunction is
       also not easy to accept. The evidence is that they were concerned about

10      the stop notices that were briefly in place. It is not clear why they would
      be concerned about those, but even if they were then those have gone

11      now. There is no real evidence that they are concerned specifically
      about the continued, and on this footing interim, maintenance of

12      potential Chinese control. This is a thriving company. **Senior personnel**

13      **have shared most of a £5m bonus pool** arising out . . . of the sale to
      Platinum (with the remainder to be distributed shortly) and would

14      doubtless be looking forward to more if Platinum sells on. I apply an
      appropriate degree of skepticism (sic ) to this attempt to rationalize (sic)

15      lower profits over the injunction period as being attributable to the
      effects of the injunction. Accordingly[,] I do not consider either of these

16      rationales for a 2% reduction in profits, and hence a reduction in the
      value of the company, as being particularly satisfactory. I shall return to

17      the question of other risks of loss below, and to some of Mr Chapman's

18      submissions about the quality of the evidence and the link with the
      injunction."

19

20

21  (Memorandum Opinion of Justice Mann issued June 21, 2020 (emphasis added)).

22  This was a clear bribe to the senior officials of Jagex to "keep quiet" about the facts that

23  Platinum never had the money, Platinum had seized control of the company illegally and

24

25

26

27  [14] The US counterpart to this form of fortification would be a performance bond or the like, which was required to be paid by Plaintiffs in England within 90-days of the issuance of the Order (and later extended by mysterious mutual agreement to 180 days after issuance of the Order and also an amount Plaintiffs in this instance action would be

28  equally willing to fortify as a condition of and within the same 90 -day period following issuance of a Preliminary injunction.

Yan was behind it all. The classic "hush money" this time being paid directly to Jagex.[15]
Moreover, based on the clear language quoted above, there is a clear party admission by
Yan that he intends to continue these bribes with additional "hush payments" as provided
above and has now dragged The Carlyle Group into it~~it~~his scheme by providing a promise
that "Senior personnel have shared most of a £5m bonus pool arising out . . . of the sale to
Platinum (with the remainder to be distributed shortly) *and would doubtless be looking
forward to more if Platinum sells on.*" to a third party such as the Carlyle Group.
(emphasis added.)

**I.     Negotiations with Minsheng**

~~39~~50.  The Plaintiff, still determined to acquire Jagex, contacted Minsheng
representatives to discuss a private acquisition of Minsheng's 45% interest in
SHNT/Jagex.[16] Minsheng was initially amenable to a deal, but upon information and
belief, Yan once again interfered and bribed employees of Minsheng to block the sale to
the Plaintiff. Minsheng and the Plaintiff exchanged fourteen (14) versions of a term sheet
over the course of two months. Despite a meeting of the minds between the two parties,
and written confirmation it was ready to sign the binding agreement on June 10, 2020,
Minsheng ultimately ceased communications with the Plaintiff without explanation.

~~40~~51.  Upon information and belief, Yan was bribing one of the key executives at
Minsheng named Lu Zhiqiang, Vice Chairman of China Minsheng Bank. as follows:

      a.   January 2020 – approximately $20,000

      b.   February 2020 -approximately $20,000

      c.   March 2020 -approximately $20,000

      d.   April 2020 -approximately $20,000

      e.   May 2020 -approximately $20,000

      f.   June 2020 -approximately $20,000

---

[15] It would not have been unordinary to award senior management after the deal had actually closed and "funded". This was not the case and here Defendants were bribing Jagex employees with dividends due to the ultimate owner of Jagex, in violation of the Stop Notice and in furtherance of Yan's continued effort to maintain control of Jagex.

[16] SHNT Ltd. contains a provision allowing either owner to have preferential rights to acquire the other's position.

g.   July 2020 -approximately $20,000

h.   August 2020 -approximately $20,000

i.    September 2020 -approximately $20,000

j.    October 2020 -approximately $20,000

k.   November 2020 -approximately $20,000

l.    December 2020 -approximately $20,000

m. January 2021 -approximately $20,000

~~41~~52.  Yan's bribes to Minsheng were coordinated and implemented from his residence in California and were ultimately successful in their purpose of attempting to stop the sale of Minsheng's 45% ownership of SHNT and Jagex to the Plaintiff and were conducted to ensure that Yan remained in control of the enterprise, Jagex, and that he could continue to utilize it to conduct illegal acts.

~~42~~53.  Had Yan not interfered, again, Plaintiff would have acquired Minsheng's rights to SHNT and Jagex along with the rights to acquire the Huarong interest.

**~~I~~J.    Negotiations with Huarong**

~~43~~54.  Plaintiff also entered negotiations directly with Huarong for a private sale of its 55% ownership interest in SHNT and Jagex. Huarong was initially interested in selling to Plaintiff but insisted that it had to follow the mandates of the State-Owned Assets Supervision and Administration Commission ("SASAC") and do a formal auction of its 55% interest. Yan inserted himself into the transaction by partnering with Carlyle Group, a global investment group based in the United States, to purchase Huarong's interest in SHNT and Jagex outside of the required SASAC process. As part of this, from California, Yan scheduled and attended a video conference with representatives of Carlyle Group and Huarong to pitch the concept.

**1.    Plaintiff Wins the Auction for Huarong's 55% Interest in SHNT and Jagex**

~~44~~55.  Huarong placed its ownership interest of 55% of SHNT and interest in Jagex in auction with an opening bid price of approximately $195MM USD. Plaintiff, through

1   subsidiary companies it formed with an Am Law 100 law firm based in Hong Kong,

2   several key advisors and a Big 4 Accounting Firm providing tax and transfer advice (as

3   required to attend the auction pursuant to Chinese law), completed the requirements to

4   become a registered bidder for these interests and received notification that it was a

5   qualified bidder and needed to deposit $1.046MM with the seller to participate in the

6   auction. Plaintiff made the $1.046MM deposit on Sunday, August 30, 2020. Plaintiff was

7   the only registered bidder for Huarong's assets, and as such, won the auction by default at

8   the list price. Pursuant to the auction guidelines, Huarong was required to present the

9   executed and sealed closing documents to the Plaintiff, making Plaintiff the beneficial

10  owner of Huarong's 55% interest in SHNT, on Friday, September 4, 2020. Plaintiff was

11  required to transfer the remaining approximate $211MM of the auction list price within

12  five business days after complete execution of the contract.[17]

13       **2.    A Binding Contract Was Created Between Plaintiff And Huarong**

14       ~~45~~56.  Placing its 55% ownership interest in SHNT and Jagex at auction

15  constituted an offer, and Plaintiff accepted that offer by placing a winning bid and making

16  the requisite deposit. The essential elements of offer, acceptance, and consideration

17  required to form a binding contract were met and, as such, Plaintiff has a binding contract

18  with Huarong and may utilize its remedies at law to enforce the terms of the contract, up

19  to and including specific performance.

20       **3.    Huarong Breached the Contract with Plaintiff due to Yan's interference**

21       ~~46~~57.  Despite its contractual obligations, Huarong did not hold up its end of the

22  bargain and failed to transfer necessary documents to Plaintiff to confirm its interest in

23  _____

24  [17] According to the auction description detailed above, once a party is registered as a qualified bidder, the party is
    required to wire a deposit of approximately $1.046MM to the seller (here, Huarong). If there is only one qualified
25  bidder registered, that bidder automatically wins the auction at the listing price and has three (3) business days to sign
    the closing documents, and an additional five (5) business days to wire the remainder of the funds to the seller.
26  Conversely, Huarong had a duty to supply certain necessary documents and refused to do so all while PSH continued
    to comply with its duties to perform. It was only when Plaintiff pressed the issue by formal letter and Huarong
    completely ignored the request or in one instance actually pretended to permit access to the English lawyers (a
27  previously agreed to request) that PSH sent a formal demand and held back the final closing funds. Plaintiff released
    some liquidated damages to the auction house subject to Huarong's requirement to solve the stale mate in one form
28  or another and Plaintiff sent in another "new" negotiator to attempt to resolve the stale mate and consistently
    maintained it was ready, willing, and able to perform if Huarong would.

SHNT and Jagex to Plaintiff as required by the Auction Instructions. Specifically, Huarong failed to produce the required documents pursuant to the Auction Guidelines to formalize the transfer and stalled on working to facilitate a payment process in compliance with international law so that Plaintiff could wire the remainder of the balance due for the asset purchase. These included:

      a.  All of the original documents relating to the trust being:

          i.    the beneficial right of 1.21018 billion trusts held by Huarong International Trust Co., Ltd. (hereinafter referred to as "Huarong Trust" or "transferor") of the Huarong Financial Control M & A loan pooled funds Trust Plan.

        ii.    the beneficial rights of 1.14518 billion trusts in the fifth, sixth and seventh phases are within the duration of the contract.

     iii.    The grant trust loans to Shanghai ~~Fukuang~~ Fukong Interactive Entertainment Co., Ltd. (hereinafter referred to as "~~Fukang~~ Fukong Company") to acquire a 49% stake in Shanghai ~~Hongdu~~ Hongtou Network Technology Co., Ltd. (hereinafter referred to as "~~HongTou~~ Hongtou Network").

     iv.    The guarantee measures to the 55% equity pledge of Macro Investment Network; Hong Investment Network, Shanghai China Technology Enterprise Group Co., Ltd. (hereinafter referred to as "China Technology Group"), and Yan Jinggang, the actual controller, bear the guarantee of joint and several liability.2. the 55% equity of the Macro Investment Network pledged to Huarong Trust (trustee),

      v.    The finally decided Shanghai Municipal second Intermediate people's Court's opinion to repay the debt to Huarong Trust (trustee) at a price of 1123276000 yuan,

      vi.     The court continued enforcement documents to the remaining

             creditor's rights of about 630 million yuan.

      vii.    The underlying assets of the trust plan are: (1) 55% equity of Macro

             Investment Network; (2) about 630 million yuan of remaining

             claims on Fortune Control, Macro Investment Network, China

             Technology Group and Yan Jinggang. "Asset Evaluation report",

   b.   "Huarong Fortune Control M & A loan pooled funds Trust Plan Fund Trust

      contract" and its supplementary agreement,

   c.   "legal opinion",

   d.   "Registration of transfer of Trust beneficial Rights", original distribution of

      creditor's rights "commitment letter" and "notice of transfer of rights",

   e.   "letter of commitment" and "notice of transfer of rights",

   f.   "Trust beneficial right transfer contract",

   g.   "Network bidding implementation Plan",

   h.   "commitment letter"

~~47~~58.  Though Plaintiff did not pay the entire sum contemplated under the contract, its actions were excused due to Huarong's initial breach. The parties continued to have what Plaintiff believed were friendly negotiations to resolve the situation while not knowing Yan was behind the scenes using his bribery tactics to derail Plaintiff. Moreover, as a result of Platinum's unlawful seizure of Jagex and bribes to Jagex employees to not speak up, Platinum was preventing a clean transfer of Jagex to Plaintiff while Yan's bribed bank agents worked on his behalf. This stalemate has continued to the present day, causing continued losses and, most importantly, preventing the Plaintiff from controlling and operating SHNT and Jagex. To this day, Plaintiff remains willing and able to complete the transactions, but is being ~~block~~blocked by the activities of Yan and the enterprise, Jagex.

~~48~~59.  Plaintiff has diligently made attempts to discuss this situation with representatives of Huarong and Minsheng. Unfortunately, both entities had "gone dark",

1  refusing to answer Plaintiff notwithstanding the required duty of Huarong to do so under

2  the contract or honor its equitable position as rightful owner of the purchase rights to at

3  least the 55% of Huarong's interest in SHNT and Jagex. Upon information and belief, the

4  failure of Huarong to honor its contractual obligations is the direct result of its acceptance

5  of a bribe by Yan. Huarong has a torrid history with bribes. Huarong Trust, a Chinese

6  state owned "bad bank" managed by China Huarong Asset Management Company, Ltd.,

7  recently made worldwide headlines as its former chairman, Lai Xiaomin, was convicted of

8  receiving or seeking bribes totaling 1.788 billion yuan ($276.72 million) from 2008 to

9  2018, when he was also a senior banking regulator, according to the Secondary

10  Intermediate People's Court of Tianjin. *See Ex-chairman of China Huarong Asset*

11  *Management sentenced to death | Reuters*.[18] A first in modern Chinese banking history,

12  "The severe treatment of Lai Xiaomin reflects the strong determination of the Central

13  Committee with President Xi Jinping as the core to administer the party and its zero

14  tolerance in punishing corruption," the company said in a statement.[19]

15  ~~49~~60.  In a message received by Plaintiff during the August Huarong auction, one

16  of Plaintiff's advisors in China reported that Yan was directing bribes to Huarong and

17  Minsheng officials in an attempt to get Huarong and Minsheng to stop working with

18  Plaintiff and accept the so called "Yan" solution. To be sure, had Yan not, again,

19  interfered with Plaintiff's rights and lawful process of acquiring the Asset, Plaintiff would

20  have completed the Huarong auction transaction and would be in possession of 55% of

21  SHNT and its proportional 55% interest in Jagex including the preferential right to

22  purchase Minsheng's interest under the SHNT Ltd. Agreement.

23  ~~50~~61.  At the time of the auction (late 2020), at least one officer of Huarong was a

24  government official of China, and Huarong itself was a government-run entity. Yan

25  caused or directed the bribes to be paid to Huarong while he was a resident of the United

26  States through the use of electronic communications. This bribe directly affected a matter

27

28  [18] https://www.reuters.com/article/us-china-huarong-lai/ex-chairman-of-china-huarong-asset-management-sentenced-to-death-idUSKBN29A0V5
[19] *Id.*

1    of interstate commerce, as Jagex was operating in California and the intended purchaser,

2    the Plaintiff, is a U.S. based entity. The bribe was made for the purpose of ensuring Yan

3    maintained control of the enterprise, Jagex.

4         5162.  The outlandish plot of this story became even more intense when, on

5    January 21, 2021, the former Chairman of Huarong was *sentenced to death* in China for

6    taking over $200,000,000 USD in bribes. Not surprising to the Plaintiff, one of the top 10

7    loans reported in the trade journals in China giving rise to this sentence was a loan made

8    to SHNT, i.e., Yan. As reported by South China Morning Post, "China Huarong Asset

9    Management, the mainland's largest bad-debt manager, has been active in funding the

10   country's biggest corporate borrowers, including a number of companies and individuals

11   firmly under the regulatory spotlight, according to a list circulated following the detention

12   of its chairman last week for suspected graft."[20]

13        5263.  The line-up is a venerable Who's Who of China's biggest corporate

14   borrowers, but also offers an intriguing glimpse into the murky workings of some of the

15   country's financing, when non-bank institutions have stepped into provide funding when

16   stringent lending guidelines fail.

17        5364.  Established in 1999 to manage the bad loans of state-owned banks, Huarong

18   has transformed itself into a financier active in lending through a variety of financial

19   products, thanks to strong levels state credit and a powerful portfolio of financial service

20   licenses. The list, issued by the load manager's head office, was intended to provide a

21   picture of its exposure to the related firms as soon as possible, a source said. The list also

22   revealed that Huarong acted as lender to a number of shadowy groups. Fukong Interactive

23   Entertainment, a Shanghai-listed company that secured loans worth more than 1.6 billion

24   yuan from Huarong units, saw its controller Yan Jinggang put under investigation by

25   China's top securities regulator on January 17 for suspected violation of securities law."

26

27

28   [20] *See* Huarong's client list offers a peek into how China's financial 'crocs and rhinos' fund their forays | South China Morning Post (scmp.com). https://www.scmp.com/business/companies/article/2143332/leaked-client-list-bad-debt-manager-huarong-reveals-mix-corporate

*See* Huarong's client list offers a peek into how China's financial 'crocs and rhinos' fund their forays | South China Morning Post (scmp.com).[21]

~~54~~65.  Yan has acted as a puppet master with regarding to Jagex since at least 2018. Yan has used Jagex as an enterprise to further his illegal activity, avoid prosecution, commit acts of fraud, and frustrate matters of interstate commerce by preventing the Plaintiff from purchasing, owning, and operating SHNT and Jagex, despite multiple rounds of diligent negotiations and willing sellers. The acts known to the Plaintiff committed by Yan in furtherance of the Jagex enterprise include:

    a.  Bribing a Government Official of China in 2019 to freeze the assets of a lender engaged by Plaintiff to purchase Jagex via judicial auction;

    b.  Delivering, through his agent Huong, the "Comfort Letter" filled with misrepresentations regarding Yan's direct relationship with Huong; and

    c.  Bribing officials at Minsheng and Huarong to cease communications with the Plaintiff and refuse to finalize the bargained-upon transfer of its 55% ownership in SHNT and Jagex to the Plaintiff after its successful bid in the August 2020 auction or through the final and negotiated agreement for Plaintiff to purchase SHNT from Minsheng.

~~55~~66.  Had Yan not committed these actions, Plaintiff would have become the 100% owner of SHNT and Jagex through the Huarong auction it won and performed on and the Minsheng Agreement that was agreed to and ready to be signed causing Plaintiff significant harm in the loss of SHNT as a unique basket of assets and its coveted subsidiary Jagex.

~~56~~67.  The Plaintiff is a lawful U.S. entity who is not accustomed to transacting with foreign criminals. It is left without remedy and has been forced to resort to legal action to protect its interest and ensure that it does not lose its irreplaceable interest in Jagex. The Plaintiff prays that this Court enjoin the Defendants from acting in furtherance

---

[21] https://www.scmp.com/business/companies/article/2143332/leaked-client-list-bad-debt-manager-huarong-reveals-mix-corporate

of this scheme and ensure that Yan cannot continue to act as puppet master to bribe,

defraud, and manipulate individuals and entities through his enterprise, Jagex, and also

that this Court require Huarong to accept Plaintiff's remittance of its purchase price for

the 55% of SHNT and transfer the 55% beneficial ownership interest to Plaintiff along

with the required documents per the Auction Description.

**K.      Allegations Related to Penal Code Section 496(a)**

5768.  Most recently, on or about January 22, 2021, members of The Carlyle

Group were placed on the board of Jagex. 58Then on or about January 25, 2021, The

Carlyle Group suddenly announced that it had purchased Jagex from MacArthur. The

Carlyle Group holds itself out as a nearly $200 billion dollar US investment management

group and US financial institution that dwarfs Plaintiff by a factor of .00000016 in

comparison to assets under management. With all that power, credibility and prestige,

Plaintiff's reward thus far for following the legal requirements of the SASAC auction

have resulted in The Carlyle Group claiming ownership to an asset that Plaintiff clearly

holds, at a minimum, a 55% beneficial ownership interest in. In essence, they claim

ownership to assets secured by fraud, theft and violations of state and federal law as

outlined in this complaint and with full knowledge of their partner Yan's means by which

they were obtained. A fact was clear on its face that the Assets were not acquired by

lawful means. and which required Plaintiff to find an alternate path to the assets away

from Yan--a requirement they failed to follow causing The Carlyle Group to claim

ownership over Plaintiff's property.

69.     The Carlyle Group purchased stolen property when it purported to acquire

100% of Jagex from Minsheng. It also knew or should have known that Plaintiff had a

contractual right to Huarong's 55% interest in Jagex because it considered bidding at the

auction and was actively monitoring the results. Of significance, The Carlyle Group

claims that at some point after Plaintiff won the auction, Huarong transferred its 55%

interest to Minsheng and ultimately a Minsheng subsidiary purported to transfer 100% of

the shares of Jagex to a subsidiary of The Carlyle Group set up specifically to accomplish

this transaction. In a declaration submitted in the state court case against The Carlyle Group by Andrew Tan, an Associate Director at The Carlyle Group, he claims The Carlyle Group did extensive due diligence on the Jagex deal. Despite this claim, The Carlyle Group has no documentation to support the transfer of Huarong's 55% interest to Minsheng. The Carlyle Group, one of the largest private equity companies in the world, in a transaction valued at $686 million dollars, on the critical issue of how Huarong transferred its 55% interest, could only state in meek terms that it "understood" that Minsheng owned 100% of Jagex and that The Carlyle Group had an "understanding" that Minsheng acquired Huarong's 55% interest. Further, Carlyle acknowledges it "was not privy to the specific details" of the acquisition, but essentially relied on representations made by Huarong and Minsheng, two notoriously corrupt banks. There is no documentation of this transfer because it if it occurred, it was illegal given that Huarong knew it was contractually obligated to transfer its 55% interest to Plaintiff and had no legal right to transfer it to Minsheng. Consequently, The Carlyle Group's purported acquisition of 100% of Jagex (including Huarong's 55% interest) was a theft.

70.    Platinum and Macarthur (having previously stolen Jagex, as detailed above) aided in this sale of Jagex to The Carlyle Group. After Yan realized he could not acquire Jagex through Platinum and Macarthur, he associated with The Carlyle Group. Yan then used his power and influence over Platinum and Macarthur as its agent to aid The Carlyle Group in acquiring Jagex.

71.    To begin, when Platinum and MacArthur falsely claimed to have purchased Jagex, appointed a Board of Directors and opened an office in Irvine, California, they created a cloud on title on Jagex's shares that resulted in litigation in England where a Stop Order was issued (as discussed above). After that Stop Order was issued, Huarong held the auction where Plaintiff successfully acquired a 55% interest in Jagex.

72.    The auction was public and upon information and belief, Platinum and MacArthur were fully aware of the results and that Plaintiff's held the legal right to 55% of Jagex. Further, Platinum and MacArthur had such knowledge through Yan, who was

1    controlling both, who was actively engaged in criminal conduct (namely bribes) in an

2    effort to block Plaintiff's acquisition of Huarong's 55% interest in Jagex.

3           73.    Platinum and Macarthur, despite knowing that they never paid a penny for

4    Jagex and had no legal right to any shares in Jagex, did not relinquish their claim to Jagex,

5    as evidenced by the continued Stop Order issued by the court in England. Macarthur also

6    issued the false press releases discussed above to facilitate the original theft in April 2020

7    and to cloud title, which had the effect of complicating Plaintiff's ability to acquire Jagex.

8           74.    After (and potentially before) Plaintiff's successful auction bid, Platinum

9    and Macarthur began negotiations with The Carlyle Group to aid and assist with The

10   Carlyle Group's purported acquisition of 100% of the shares of Jagex. Despite Platinum

11   and Macarthur's bogus claim to ownership of Jagex, The Carlyle Group, nonetheless, felt

12   it was important to get releases from them of their claimed interest. This was

13   accomplished by the parties, and others, signing a "Framework Deed" prepare by The

14   Carlyle Group that cleared the path to The Carlyle' Group's purported acquisition of

15   100% of Jagex from Minsheng. The Deed was executed on or about December 10, 2020

16   by Duke, individually and on behalf of Platinum.

17          75.    Platinum and Macarthur participated or aided in the thrice-stolen Jagex—

18   first by Platinum and Macarthur, second by Minsheng of Huarong's 55% interest (owned

19   by Plaintiff) and finally by The Carlyle Group.

20                              **V. CAUSES OF ACTION**

21                              **FIRST CAUSE OF ACTION**

22          **(Federal Civil RICO, 18 U.S.C. § 1962(~~b~~a) Against Yan)**

23   ~~59~~76.  Plaintiff incorporates by reference all the preceding paragraphs of this

24   Complaint as if fully set forth herein.

25   ~~60~~77.   Yan, Macarthur, Belle, Duke and Huang violated RICO and Plaintiff was

26   injured as a result.

27   ~~61~~78.   Yan ~~is a "person~~, Belle, Duke and Huang are "persons" capable of holding

28   legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

62 79.   Yan, Macarthur, Belle, Duke and Huang violated 18 U.S.C. § 1962(b a) by the acts described in the prior paragraphs, and as further described below.

63 80.   The Enterprise. Yan operated The Enterprise. Yan, Belle, Duke and Huang engaged in the conduct of their affairs through a continuing pattern of racketeering activity in order to invest Yan's ill-gotten gains in Platinum and use Platinum to gain control over and operate Jagex for the common and continuing purpose herein and constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.).

64 81.   The enterprise has engaged in, and its activities have affected, foreign commerce.

82.   Yan Derived Income From Racketeering Activities.

83.   As detailed above, Yan derived his income from a fraudulent pier to pier lending scheme for several years ending in approximately 2018 whereby Yan committed wire fraud to divest innocent third parties of millions of dollars in China. Pursuant to this scheme, Yan set up what appeared to be a legitimate pier to pier lending platform referred to as t the Nanjing Fu Rong Bao P2P Platform. Although this platform appeared to be legitimate providing fraudulent information for approximately 2,300 different companies purporting to show these companies as legitimate business enterprises. In fact, these were all fake shell companies with no operations or actual business and the money collected from investors was instead put into a company called Shanghai Zhongji Enterprise Group, which was a company that had been blacklisted by a Chinese Court and was a notoriously corrupt entity. The funds placed into that entity were then funneled into the hands of several masterminds behind the fraudulent scheme including Yan.

84.   As a result of this scheme, among other things, Yan is an individual who has been the subject of international criminal investigations, removal and formal censorship from the regulators of the Shanghai Stock Exchange for his participation in money laundering, bribery, and outright fraud, which include a trail of 30,000 victims in China and America, the creation of over 1,200 shell companies to funnel laundered funds, and

1    over 404 pending civil lawsuits and criminal investigations, including the criminal

2    sentencing of his former partner Liang Zhenbang and the death sentence of his former

3    lender at Huarong, Lai Xiaomin.

4         85.    Yan engaged in this conduct for years until he was forced to leave China in

5    October of 2018 to avoid criminal prosecution as a result of his illicit racketeering

6    activities.

7         86.    Yan With the Assistance of Belle, Duke and Huang Invested Yan's

8    Racketeering Revenue in Platinum and Jagex.

9         87.    Yan repeatedly invested funds into Platinum to establish platinum, to pay

10   the costs of operating Platinum, to pay the costs associated with participating in the initial

11   private auction of Jagex by SHNT including but not limited to flying Platinum

12   representatives to China to participate in the Jagex auction and, once Plaintiff discovered

13   the truth about Yan's affiliation with Belle, Duke and Huang and the source of Platinum's

14   limited partner's funds, Yan provided the payment to purchase the general partnership

15   rights under the MUPA.

16        88.    The funds invested in Platinum by Yan were all funds obtained through the

17   above-described racketeering activity. Specifically, the fraudulent Chinese pier to pier

18   lending scheme.

19        89.    Continuity of Conduct. Yan's violations of federal law as set forth herein,

20   each of which directly and proximately injured Plaintiff and other market participants,

21   constituted a continuous course of conduct spanning a period from approximately 2018 to

22   present (and prior when including the underlying source of the proceeds from racketeering

23   activity), which was intended to launder the proceeds of Yan's racketeering activity in

24   China. Therefore, said violations were a part of a pattern of racketeering activity under 18

25   U.S.C. § 1961(l) and (5).

26        90.    Yan with the assistance of Belle, Duke and Huang repeatedly invested the

27   proceeds of Yan's racketeering activity into Platinum in their effort to launder Yan's

28

1   illicitly obtained money in violation of 18 U.S.C. § 1962(a), while, as discussed below,

2   trying to take control of Jagex from Plaintiff in violation of 18 U.S.C. § 1962(b).

3       91.   The unlawful actions of Yan with the assistance of Belle, Duke and Huang

4   have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff

5   in its business. Plaintiff seeks an award of damages in compensation for, among other

6   things, the 100s of millions of dollars that Defendants stole from Plaintiff and the value of

7   Jagex.

8       92.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff accordingly seeks an award of

9   three times the damages it sustained, and the recovery of reasonable attorneys' fees and

10   costs of investigation and litigation, as well as any other relief as authorized by statute.

11   **SECOND CAUSE OF ACTION**

12   **(Federal Civil RICO, 18 U.S.C. § 1962(b) Against Yan, Macarthur, Belle, Duke and**

13   **Huang)**

14       93.   Plaintiff incorporates by reference all the preceding paragraphs of this

15   Complaint as if fully set forth herein.

16       94.   Yan, Macarthur Belle, Duke and Huang violated RICO and Plaintiff was

17   injured as a result.

18       95.   Yan, Macarthur, Belle, Duke and Huang are "persons" capable of holding

19   legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

20       96.   Yan, Macarthur, Belle, Duke and Huang violated 18 U.S.C. § 1962(b) by

21   the acts described in the prior paragraphs, and as further described below.

22       97.   The Enterprise. Yan, Macarthur, Belle, Duke and Huang engaged in the

23   conduct of their affairs through a continuing pattern of racketeering activity in order to

24   gain control over and operate Jagex for the common and continuing purpose herein and

25   constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4).

26       98.   The enterprise has engaged in, and its activities have affected, foreign

27   commerce.

28

1    6599.  Pattern of Racketeering Activity. Yan, Macarthur, Belle, Duke and Huang

2    did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in

3    the affairs of the enterprise through a pattern of racketeering activity within the meaning

4    of 18 U.S.C. § 1961(1), 1961(5) and 1962(b). The racketeering activity was made possible

5    by Yan's Yan, Macarthur, Belle, Duke and Huang's regular and repeated use of the

6    services of the enterprise. Yan, Macarthur, Belle, Duke and Huang had the specific intent

7    to engage in the substantive RICO violations stated herein.

8    66100. Predicate acts of racketeering activity are acts which are indictable under

9    provisions of the U.S. Code enumerated in 18 U.S.C. §1961(1)(B), as more specifically

10   stated below. Yan, Macarthur, Belle, Duke and Huang each committed at least two such

11   acts or else aided and abetted in such acts.

12   67101. The acts of racketeering were not isolated, but rather the acts of the Yan,

13   Macarthur, Belle, Duke and Huang were related in that they had the same or similar

14   purpose and result, participants, victims, and method of commission. Further, the acts of

15   racketeering by Yan, Macarthur, Belle, Duke and Huang have been continuous. There was

16   repeated conduct during a period of time beginning in approximately 2018 and continuing

17   to the present, and there is a continued threat of repetition of such conduct.

18   68102. The enterprise was not limited to the predicate acts and extended beyond the

19   racketeering activity. The enterprise existed separate and apart from the pattern of

20   racketeering activity for the legitimate business purpose of creating and publishing online

21   games. Yan, Macarthur, Belle, Duke and Huang has had and does have, upon information

22   and belief, legitimate business plans outside of the pattern of racketeering activity.

23   69103. Yan, Macarthur, Belle, Duke and Huang participated in the operation and

24   management of the enterprise by overseeing and coordinating the commission of multiple

25   acts of racketeering as described below.

26   70104. Predicate Act: Acts (Yan, Macarthur, Belle, Duke and Huang): Use of Wires

27   to Defraud Plaintiff in violation of 18 U.S.C. § 1343. Yan Yan, Macarthur, Belle, Duke

28   and Huang committed acts constituting indictable offenses under 18 U.S.C. § 1343 in that

1   ~~he~~under the direction of Yan devised or intended to devise a scheme or artifice to defraud

2   Plaintiff or to obtain money from Plaintiff by means of false or fraudulent pretenses,

3   representations, or promises. For the purpose of executing ~~his~~Yan's scheme or artifice,

4   Yan, Macarthur, Belle, Duke and Huang transmitted or caused to be transmitted by means

5   of wire communications in interstate or foreign commerce various writings, signs, and

6   signals. The acts ~~of Yan~~ set forth above were done with knowledge that the use of the

7   wires would follow in the ordinary course of business, or that such use could have been

8   foreseen, even if not actually intended. These acts were done intentionally and knowingly

9   with the specific intent to advance ~~Yan's~~the scheme or artifice contrived of by Yan and

10  executed with the assistance of Macarthur, Belle, Duke and Huang.

11  ~~71.~~105.Yan, Belle, Duke, Huang and Macarthur carried out ~~his~~this scheme in

12  different states and countries and could not have done so unless they used interstate wires.

13  In furtherance of their scheme; Yan and his agents, Belle, Duke, Huang and Macarthur,

14  Huarong and its employees as a state actor and public entity, Minsheng and its employees

15  as a state actor and public entity, Lu Zhiqiang as a state actor and public official, SHNT,

16  Platinum and MacArthur and the claimed new owners The Carlyle Group communicated

17  among themselves and with Plaintiff in furtherance of the scheme to defraud Plaintiff and

18  maintain control of Jagex. These communications were typically transmitted by wire (i.e.~~.~~

19  ~~electronically). Yan also transmitted or caused the "Comfort Letter" to be transferred by~~

20  ~~mail or wire on or about April 20, 2019, and upon information and belief,~~

21  ~~communications with officers of Platinum, MacArthur, SHNT, Huarong, Minsheng, and a~~

22  ~~Government Official of China during the course of negotiations of the transfers of Jagex~~

23  ~~throughout 2018 to the present.~~., electronically).

24  ~~72.~~106.Specifically, Yan, through the use of various agents and representatives of

25  the various entities involved in the Jagex acquisitions and transfers, directed those

26  individuals to use wire to:

27  a.      ~~Deliver~~a.      Have Belle and Duke represent to Plaintiff via interstate wire

28  using phone and email on numerous occasions in or about March and April of 2019 that

the money being used to fund Platinum and the proposed acquisition of Jagex through
Platinum was not in any way connected to or received from Yan or any current or former
employee of SHNT and that neither Huang, Belle nor Duke were involved in any way
with Yan;

b.      Have Huang execute and transmit and Belle deliver to Plaintiff the "Comfort
Letter" to the Plaintiff on April 10, 2019;

b.      Deliver thec.  Have Huang and Belle deliver the fraudulent purported "proof
of funds" to Plaintiff on June 19, 2019;

d.      Deliver the purported representations as to the source of funds, D.L. bank
account being used for funding the transaction of the limited partner for the purchase on
or about July 18-July 22, 2019;

e.      Negotiate the terms of the proposed acquisition of the 45% ownership of
SHNT/Jagex by Minsheng Trust by the Plaintiff between May 2, 2020 through June 10,
2020; and

f.      Negotiate the transfer of Huarong's 55% interest in SHNT/Jagex to the
Plaintiff in June through September 2020.

g.      Have Macarthur post fraudulent statements on its website meant to interfere
with and prevent Plaintiff from lawfully acquiring Jagex including a statement dated April
28, 2020 indicating that Platinum had paid $530MM USD in exchange for the acquisition
of Jagex when in fact Macarthur had not paid any funds whatsoever and a statement dated
May 1, 2020 denying that Platinum had "completed" an acquisition of Jagex even though
no funds had yet been transferred in exchange for the alleged "purchase" of Jagex and
further fraudulently claiming that "[n]either Macarthur . . . nor Platinum . . . has received a
Stop Order from the British Court" despite having clearly received such notice and even
responding to and making filings in the UK proceedings. Macarthur's false statements
remained on their website even as of the day of the filing of this complaint without any
correction or update.

73107.In addition, and in furtherance of their scheme, Yan through Belle, Duke, Huang and Macarthur used wires to induce Plaintiff to enter the limited partnership, Platinum, for the purpose of Plaintiff's acquisition of Jagex.

74108.Yan also caused Plaintiff to transmit millions of dollars in funds by wire to and from accounts in the United States and internationally; and directed other individuals to wire funds in a similar fashion in furtherance of his scheme.

75109.Yan's objective was and is to divert funds for his own benefit, facilitate the payment of bribes in an effort to defraud investors, including Plaintiff, and to maintain ownership and control of Jagex.

76110.Plaintiff reasonably and justifiably relied upon Yan'sYan, Belle, Duke and Huang's false representations, false pretenses, and deceptive communications, and other interested third parties reasonably relied on Macarthur's fraudulent statements and Plaintiff has been damaged as a direct and proximate result of Yan'sYan, Belle, Duke, Huang and Macarthur's false representations and participation in such enterprise.

77111.Predicate Act: (Yan): Violations of Foreign Corrupt Practices Act in Violation of 18 U.S.C. § 1952 (Travel Act Violations). Yan utilized various methods of communication, including electronic mail, video conferencing, and messaging platforms to communicate with individuals in the United States and China in order to commit the unlawful activity of facilitating bribes to foreign officials. Specifically, Yan engaged in a pattern of bribes to Chinese Government Officials and officials of the state-owned banks, Minsheng and Huarong, beginning in 2018 and continuing to the present day in violation of 15 U.S.C. 55 78dd-2. The purpose of these bribes was to ensure that Yan maintained control of the enterprise Jagex.

78112.Platinum and Jagex, are each domestic concerns within the meaning of 15 U.S.C. 78dd-2(a). Yan was at all times an agent of, director or employee of one or both of these companies and acting on their behalf within the meaning of 78dd-2(a). Yan was at all times a shareholder of SHNT. In addition, Yan acted as the agent of Jagex, Platinum,

and SHNT for purposes of making illegal payments to, and improperly influencing, one or more senior officials of the Republic of China.

79113. Upon information and belief, Yan made use of the wires and other means of interstate commerce corruptly in order to offer and promise to pay bribes, kickbacks and other payments to one or more senior officials of Republic of China in order further their scheme to defraud Plaintiff and maintain control of Jagex.

80114. Improper payments were made to a foreign official within the meaning of 15 U.S.C. § 78dd-1(a)(l). Yan made these payments in order to (1) influence a senior government official to agree to fraudulent transactions unfavorable to Plaintiff, in violation of his duties as a government official, (2) induce a senior government official to use his influence with the Republic of China to affect or influence China's decisions with regard to Plaintiff's, Jagex's, SHNT's, Minsheng's and Huarong's activities, including the proposed sales, and (3) secure an improper business advantage for Defendant. Yan performed these illegal acts in order to maintain control of Jagex and prevent Plaintiff from asserting his lawful ownership and control of Jagex.

81115. Upon information and belief Yan also ensured that employees of Minsheng and Huarong would receive money improperly siphoned from Jagex while knowing that a portion of such money would be given to a senior government official.

82116. Plaintiff has been damaged as a direct and proximate result of Yan'sYan's illegal payments to one or more former senior officials of Minsheng and Huarong and the Republic of China.

83117. Continuity of Conduct. Yan'sYan, Macarthur, Belle, Duke and Huang's violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff and other market participants, constituted a continuous course of conduct spanning a period from approximately 2018 to present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

84118. Yan violated the Travel Act and Yan, Macarthur, Belle, Duke and Huang each violated the Wire Fraud statutes to take control of Jagex from Plaintiff in violation of 18 U.S.C. § 1962(b). Section 18 U.S.C. § 1962(b), states, in pertinent part, that a violation is committed by engaging in a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

85    The unlawful actions of Yan119.   The unlawful actions of Yan Macarthur, Belle, Duke and Huang have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business. Plaintiff seeks an award of damages in compensation for, among other things, the 100s of millions of dollars that Defendants stole from Plaintiff and the value of Jagex.

120.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## THIRD CAUSE OF ACTION

have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business. Plaintiff seeks an award of damages in compensation for, among other things, the 100s of millions of dollars that Defendants stole from Plaintiff and the value of Jagex.

86Pursuant to 18 U.S.C. § 1964(c), Plaintiff accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## SECOND CAUSE OF ACTION

**(Conspiracy to violate Federal Civil RICO, 18 U.S.C. § 1962(d) Against All Defendants)**

87121. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

88122.In violation of 18 U.S.C. § 1962(d), Yan engaged in violations of the Travel Act and wire fraudYan, Macarthur, Belle, Duke and Huang each violated the Wire Fraud statutes to illegally take control of Jagex from Plaintiff in violation of 18 U.S.C. § 1962(b).

89123.The conspiracy commenced at least as early as 2018 and is ongoing.

90124.The conspiracy's purpose was to divert money from Jagex to their own benefit, to facilitate the payment of bribes in an effort to defraud Plaintiff and other investors, and to ensure that Defendant Yan maintained control of Jagex.

91125.Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included misleading Plaintiff as to its connection with the enterprise Jagex, making misleading statements to the Plaintiff regarding Huarong's intentions of transferring its 55% interest in SHNT and Jagex to the Plaintiff, facilitating the payment of all bribes as described above, and concealing their intentions to allow Yan to maintain control of Jagex regardless of actual ownership.

92126.Defendants agreed to the overall objectives of Yan, which was for him to illegally gain control of Jagex through the pattern of racketeering activity described herein. Defendants are jointly and severally liable for damages caused by the RICO violations.

93127.Plaintiff has been injured and continues to be injured in its business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property. Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks an award of damages in compensation for, among other things, the 100s of millions of dollars that Defendants stole from Plaintiff and the value of Jagex. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**FOURTH CAUSE OF ACTION**

1    ~~THIRD CAUSE OF ACTION~~

2    **(Breach of Contract Against Huarong)**

3    ~~94~~128. Plaintiff incorporates by reference all the preceding paragraphs of this

4    Complaint as if fully set forth herein.

5    ~~95~~129. Plaintiff and Huarong entered into a valid and binding written contract for

6    the purchase and sale of Huarong's 55% interest in SHNT and Jagex as a result of

7    Plaintiff's successful bid in the 2020 Chinese auction.

8    ~~96~~130. Plaintiff did all, or substantially all, of the significant things that the contract

9    required it to do (i.e., depositing funds in the amount of $1,056,200.00).

10   ~~97~~131. Plaintiff was excused from further performing (i.e., depositing funds in the

11   amount of $1,056,200.00) because Huarong failed to comply with its contractual

12   obligations to sign and deliver the transfer documents within three (3) days of the

13   announcement of Plaintiff's winning bid, which was a condition precedent to Plaintiff

14   making the final payment. Huarong failed and refused, and continues to fail and refuse, to

15   sign and deliver the transfer documents, in direct breach of its contractual obligations.

16   ~~98~~132. Because of Huarong's breach, Plaintiff has been unable to assert its

17   bargained-for ownership and control of SHNT and Jagex and has suffered significant

18   damages. Plaintiff is entitled to specific performance of the contract.

19   ~~99~~133. Huarong's breach of contract was a substantial factor in causing Plaintiff's

20   harm.

21   ~~FOURTH CAUSE OF ACTION~~

22   **FIFTH CAUSE OF ACTION**

23   **(Breach of Implied Covenant of Good Faith and Fair Dealing Against Huarong)**

24   ~~100~~134.    Plaintiff incorporates by reference all the preceding paragraphs of

25   this Complaint as if fully set forth herein.

26   ~~101~~135.    Plaintiff and Huarong entered into a valid and binding written

27   contract for the purchase and sale of Huarong's 55% interest in SHNT and Jagex as a

28   result of Plaintiff's successful bid in the 2020 Chinese auction.

102136.     Plaintiff did all, or substantially all, of the significant things that the contract required it to do (i.e., depositing funds in the amount of $1,056,200.00).

103137.     Plaintiff was excused from further performing (i.e., depositing funds in the amount of $1,056,200.00) because Huarong failed to comply with its contractual obligations to sign and deliver the transfer documents within three (3) days of the announcement of Plaintiff's winning bid, which was a condition precedent to Plaintiff making the final payment. Huarong failed and refused, and continues to fail and refuse, to sign and deliver the transfer documents, in direct breach of its contractual obligations.

104138.     Huarong did not act fairly and in good faith when it failed to sign and deliver the transfer documents within three (3) days of the announcement of Plaintiff's winning bid, which presented Plaintiff form receiving the benefits under the contract, namely a 55% interest in SHNT and Jagex.

105139.     Plaintiff was harmed by Huarong's conduct.

### ~~FIFTH~~SIXTH CAUSE OF ACTION

### (Conversion Against Yan and Huarong)

106140.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

107141.     Plaintiff had a right to a 55% interest in SHNT and Jagex through its successful bid in the 2020 auction.

108142.     Huarong and Yan substantially interfered with Plaintiff's 55% ownership interest by knowingly or intentionally preventing Plaintiff from completing the transaction and thereby maintaining ownership of that interest despite Plaintiff's successful auction bid.

109143.     Plaintiff did not consent to the wrongful conduct of Huarong and Yen

110144.     Plaintiff was harmed.

111145.     Huarong and Yan's wrongful conduct was a substantial factor in causing Plaintiff's harm.

### SEVENTH CAUSE OF ACTION

**(Intentional Interference With Contractual Relations Against Yan, Platinum and
Macarthur)**

~~112~~146.      Plaintiff incorporates by reference all the preceding paragraphs of
this Complaint as if fully set forth herein.

~~113~~147.      Plaintiff had a valid and enforceable written contract with Huarong
for the purchase of 55% of SHNT and Jagex as a result of its successful bid in the 2020
Chinese auction.

~~114~~148.      Defendant Yan, individually and acting as agent for Platinum and
MacArthur (and later The Carlyle Group), was fully aware of this contract due to his
consistent control of and association with Jagex and his operation of the Jagex enterprise.
Further, the results of the auction were matters of public record.

~~115~~149.      Upon information and belief, Yan, individually and acting as agent
for Platinum and MacArthur (and later The Carlyle Group), bribed officers and/or
employees of Huarong in exchange for an agreement by Huarong to stall and eventually
renege on the completion of the transfer of its 55% ownership interest in SHNT and Jagex
to the Plaintiff, thereby preventing performance.

~~116~~150.      Yan's actions were successful, and Huarong did fail and refuse and
continues to fail and refuse to complete the transfer of its interest in SHNT and Jagex to
the Plaintiff.

~~117~~151.      Yan intended to disrupt the performance of the contract.

~~118~~152.      Plaintiff was damaged by this intentional interference and subsequent
breach because Plaintiff has not been able to enjoy the ownership and control of SHNT
and Jagex which it is entitled to and has suffered significant monetary damages.

~~119~~153.      Yan's conduct was a substantial factor in causing Plaintiff's harm.

**EIGHTH CAUSE OF ACTION**

~~SEVENTH CAUSE OF ACTION~~

**(Tortious Interference with Prospective Economic Relations Against Yan, Platinum
and Macarthur)**

120154.	Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

121155.	Plaintiff had an economic relationship with Minsheng. Plaintiff emailed fourteen (14) versions of a term sheet for the purchase of Minsheng's 45% ownership interests in SHNT and Jagex, and Plaintiff and Minsheng reached an agreement regarding all terms of the private sale of Minsheng's interests to Plaintiff. This sale would have benefitted Plaintiff because, upon completion of the sale, Plaintiff would have owned 45% of SHNT and Jagex and benefitted from such control and ownership.

122156.	Defendant Yan was aware of Plaintiff's relationship with Minsheng and existence of the contract due to his consistent control of and association with Jagex and his operation of the Jagex enterprise.

123157.	Upon information and belief, information and belief, Yan bribed officers and/or employees of Minsheng in exchange for an agreement by Minsheng to stall and eventually renege the completion of the transfer of its 45% ownership interest in SHNT and Jagex to the Plaintiff.

124158.	Yan intended to disrupt the performance of the contract.

125159.	Yan's actions were successful, and Minsheng ceased communications with the Plaintiff despite a meeting of the minds and finalized term sheet between Plaintiff and Minsheng concerning the sale of Minsheng's 45% interest in SHNT and Jagex.

126160.	The Plaintiff was damaged by this intentional interference because Plaintiff has not been able to enjoy the ownership and control of SHNT and Jagex.

127161.	Yan's conduct was a substantial factor in causing Plaintiff's harm. Indeed, but for Yan's interference, the purchase and sale transaction between Minsheng and the Plaintiff would have been completed.

**NINTH CAUSE OF ACTION**

**EIGHTH CAUSE OF ACTION**

**(Declaratory Relief Against Huarong)**

1    ~~128~~162.       Plaintiff incorporates by reference all the preceding paragraphs of

2    this Complaint as if fully set forth herein.

3    ~~129~~163.       Plaintiff and Huarong entered into an agreement for the purchase of

4    Huarong's 55% interest in SHNT and Jagex.

5    ~~130~~164.       A justiciable controversy exists with respect to whether Plaintiff's

6    performance under the contract was excused because of Huarong's failure to sign and

7    deliver the transfer documents within three (3) days of the announcement of Plaintiff's

8    winning bid.

9    ~~131~~165.       A justiciable controversy exists with respect to whether the Huarong

10   SASAC auction was the only way to purchase Huarong's 55% interest in SHNT and

11   Jagex.

12   ~~132~~166.       Accordingly, Plaintiff seeks a declaratory judgment that the Huarong

13   SASAC auction was the only way to purchase Huarong's 55% interest in SHNT and

14   Jagex;

15                   ~~NINTH CAUSE OF ACTION~~

16                   **TENTH CAUSE OF ACTION**

17   **(Violation of California Penal Code §496(a) Against Platinum and ~~The Carlyle~~**

18                   **~~Group)~~MacArthur))**

19   ~~133    Plaintiff incorporates by reference all the preceding paragraphs of this~~

20   ~~Complaint as if fully set forth herein.~~

21   ~~134~~167.       Both Platinum and ~~The Carlyle Group~~Macarthur, for their own

22   financial gain, have (1) engaged in a manner of theft and received and/or concealed stolen

23   property as defined by California Penal Code §§ 484(a) and 496(a); or (2) aided and

24   abetted the other ~~defendants~~parties in selling, receiving and/or concealing stolen property

25   in a manner of theft as defined by California Penal Code, §§ 484(a) and 496(a).

26   ~~135~~168.       Penal Code § 496(a) makes receiving or buying property "that has

27   been obtained in any manner constituting theft or extortion, knowing the property to be

28   stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or

withholding any property from the owner, knowing the property to be so stolen or

obtained," a criminal offense punishable by imprisonment.

136169.     Penal Code § 496(c) provides that any person "who has been injured

by a violation of [subdivision (a)] . . . may bring an action for three times the amount of

actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's

fees."

137170.     Based on the statutory language, a criminal conviction under Penal

Code § 496(a) is not a prerequisite to recover treble damages under Penal Code § 496(c).

138171.     The phrase "any manner constituting theft" under Penal Code §

496(a) has been broadly construed and includes, *inter alia*, theft by false pretense and is

further defined in Penal Code § 484(a) as being: "Every person who shall feloniously

steal, take, carry, lead, or drive away the personal property of another, or who shall

fraudulently appropriate property which has been entrusted to him or her, or who shall

knowingly and designedly, by any false or fraudulent representation or pretense, defraud

any other person of money, labor or real or personal property, or who causes or procures

others to report falsely of his or her wealth or mercantile character and by thus imposing

upon any person, obtains credit and thereby fraudulently gets or obtains possession of

money, or property or obtains the labor or service of another, is guilty of theft."

139172.     As alleged in detail herein, Platinum and thenMacArthur initially

purported to acquire Jagex through theft in April 2020 and later aided in the sale of Jagex

to The Carlyle Group purchased Jagex, an asset stolen or procured through theft or

extortion.

140173.     As alleged in detail herein, both Platinum and The Carlyle

GroupMacarthur knew that Jagex had been stolen or procured through theft or extortion.

141174.     As a direct and proximate result of Platinum and The Carlyle

Group'sMacarthur's conduct, Plaintiff has sustained actual damages in an amount to be

proven at trial but not less than $800,000,000, exclusive of interest and costs.

1   142.   Platinum and The Carlyle Group are responsible for the conduct of the other

2   Defendants as their principal and/or employer.

3   143175.   Under Penal Code § 496(c), Plaintiff constitutes a person who has

4   been injured by a violation of Penal Code § 496(a) and hereby demands treble damages,

5   costs of the suit, and attorneys' fees.

6   **VII~~VI~~. PRAYER FOR RELIEF**

7   WHEREFORE, Plaintiff respectfully requests judgment against Defendants and the

8   DOE defendants as follows:

9   1.   For injunctive relief preventing the Defendants from selling, transferring, or

10      conveying the shares of SHNT and Jagex or making distributions of

11      dividends from SHNT and Jagex until this matter may be adjudicated by the

12      Court;

13   2.   For the creation of a constructive trust naming the current claimed owners of

14      Jagex and SHNT as Trustees;

15   3.   For specific performance of Huarong's contractual obligations to transfer its

16      55% interest in SHNT and Jagex;

17   4.   For a declaratory judgment affirming that the Huarong SASAC auction was

18      the only way to purchase Huarong's 55% interest in SHNT and Jagex;

19   5.   For general, compensatory, consequential, exemplary, punitive and trebled

20      damages according to proof;

21   6.   For three times the amount of actual damages pursuant to Cal. Penal Code

22      Section 496(c);

23   7.   For attorneys' fees and costs; and

24   8.   For such other relief as the Court may deem just and proper.

25

26

27

28

DATED: ~~February 1~~October 22, 2021     LEVATOLAW, LLP

By: /s/ Stephen D. Weisskopf

Stephen D. Weisskopf
~~ATTORNEYS FOR PLAINTIFF~~
~~Plutos Sama Holdings, Inc.~~
Attorneys for Plaintiff PLUTOS SAMA
HOLDINGS, INC.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action herein.

DATED: ~~February 1~~October 22, 2021     LEVATOLAW, LLP

By: /s/ Stephen D. Weisskopf

Stephen D. Weisskopf
~~ATTORNEYS FOR PLAINTIFF~~
~~Plutos Sama Holdings, Inc.~~
Attorneys for Plaintiff PLUTOS SAMA
HOLDINGS, INC.